Good afternoon. May it please the court. I'm Greg Kirtner on behalf of the National Collegiate Athletic Association. I'd like to reserve 10 minutes for rebuttal, if I may. I'd like to begin by saying something that's in a number of the cases, and that is, if you seek a bundle and you get a pittance, that it must be commensurate. The award, if any, must be commensurate with the results of the litigation is embodied in the Supreme Court decisions and in opinion after opinion in this court. So then the question becomes, did the plaintiffs here get less than they sought? And the answer to that, as they concede in their brief, is clearly, yes, they got considerably less than they sought. Depending, we can disagree about how much less, but they got considerably less. And that is the first error of law, and perhaps the most fundamental one, committed by the district court. The district court, contrary to the principle of that it must be commensurate, laid down by the Supreme Court in Hensley, instead adopted an all-or-nothing, winner-take-all, Game of Thrones approach to fee awards, no middle ground. Those are all concepts that appeared in the lower court record, all of which are inconsistent. So these plaintiffs who set out to revolutionize intercollegiate sports and failed, who set out to accomplish all in item after item, which I can detail, achieved one small, narrow injunction, which is very circumspect and circumscribed in its effect, and in fact no one knows that it's had any effect. You have ongoing litigation over in antitrust, don't you? There is subsequent litigation. Back before Judge Wilkins on other matters? Yes, that's correct. And you won't be arguing as to whether the NCAA is subject to the antitrust laws, will you? It may vary by the restraint or the rule in question. You'll be arguing as to what the scope of the antitrust laws are, but you won't be arguing as to whether the antitrust laws apply to the NCAA. Certainly the non-commercial argument will not be made in that case, I don't believe. But with all respect, that is not the test. The test is not whether... That was a preliminary issue that had to be resolved and was resolved by our court. That was a preliminary question that you argued in the last case. Absolutely correct. And that one was a very important holding because the NCAA had not been subjected to the antitrust laws before. You argued that you weren't subject to them. We decided that you were, and yes, the remedy that came after that was not as nearly as lucrative, but it was still pretty significant. So, Judge Bybee, you're absolutely correct. There was an important issue of law resolved against the NCAA by this panel in that. But the test is what benefit was achieved for the plaintiffs? What relief in the real world? So the test is relief, not whether the case is noteworthy as a matter of law, not whether it's interesting to readers of the sports pages, not whether it's even interesting to lawyers. The test is what effect in the real world, what material benefit was delivered by the case to named plaintiffs or members of the class? And that is the real test here. And that is the test they fail. But I'm getting a little ahead of myself, and that is that I still want to make the point that the important, fundamental initial question is that the relief in terms of fee award must be commensurate with the relief obtained for the named plaintiffs or members of the class by the litigation, by the outcome of the litigation. And it can't be all or nothing. And what happened in the lower court, what Judge Wilkin approved was $42 million, which was nearly everything they asked for. And that violates the rule of Hensley and all the other cases. Now, there's some related but similar violations and errors of law, and that is the district court said... Well, let me stop you there. So if your principle is correct, it's got to be commensurate. So what principle do we apply here? That they don't get anything? So we have argued that they're entitled to nothing. A court, you could disagree with me on that, in which case they then have to get a much reduced amount. And what principle of proportionality or commensurability do we apply here? The cases are sort of all over the map on that, and some of them use a percentage approach. Some of them look at the hours. Give me a suggestion as to what you're recommending. So, yes... If you choose a figure that I think is unreasonable, it may cut against the persuasiveness of your argument. Let me tell you the logic that I would apply in answering that question. The case had two distinct facets. One was the pre-2013 litigation, which involved former student athletes led by Mr. O'Bannon and others, who thought that their name, image, and likeness had been used in video games and in the aftermarket after they left college and exhausted their eligibility. We litigated that case for over three years. When the plaintiffs moved for class certification, they abruptly changed their theory of the case, and they sought to certify a class and to assert a theory that attacked amateurism head-on. Prior to that, amateurism was not a defense, because we weren't talking about amateurs. We were talking about people who were out of school. They then switched from former student athletes to current student athletes, and we then litigated that starting in July of 2013 through the end of the trial. And so, all of the work in that first three-year period came to naught. There was no relief awarded to anyone in that first three-year period. No named plaintiff, no class member, no former student athlete got anything out of this litigation. So, that's about half of their time. That's about half of their $42 million attributable to that time period. We say they should get nothing for that. So, that leaves about $21 million. Of that, we think it should be further reduced by the time spent litigating against EA and CLC. There was a partial reduction made by Judge Wilken on that, but it needs to be reduced by about another $6 million for that time, because that was independent of the litigation against the NCAA, and furthermore, it was settled. I thought that the plaintiffs had made some adjustments for the EA litigation. They did, but there were a whole bunch of additional time entries that reflected CLC and EA work, which was mixed together because of block billing, so you couldn't separate it out. And Judge Wilken made no reduction for those. And so, we think that should come out. We think block billing should come out, because it makes it impossible to do the allocation. And that's about 50% of their total. So, that gets you down to about $7 million, between $6 and $7 million. And I would argue for zero, but certainly, if you were to apply a commensurate test, that would be one way of getting there. So, you're pretty much all or nothing as well. So, well, we've argued it both ways, Your Honor, and I believe that if you actually look at the outcome of this litigation, the results, as awarded by this court and affirmed by this court, I know you dissented in part, was that a very narrow injunction involving NIL was the outcome, and all it says is that the NCAA may not prohibit its schools from offering student athletes or prospective student athletes some form of a compensation or a scholarship for the use of their NILs between the grant and aid, the old definition of grant and aid, and their total cost of attendance. And this panel clearly said cost of attendance is a bright line. You reaffirmed that. That was a victory for the NCAA, and for which we thank you. And, but the NIL injunction that remained is exceedingly narrow. Right. So, we get back to Judge Bybee's question. What principle, if we're just looking at the degree of success, what principle of proportionality should we apply? What you argued before was you have to discount, eliminate certain blocks of certain components of the award. But, I gather your argument now is more of a proportionality argument as to the degree of their success. And then, getting back to Judge Bybee's question, what principle should we apply in determining that? So, my first argument, and you're right that I am arguing in the alternative here, is that NIL injunction is actually not worth anything. It is worth nothing in the real world. There is no person who's alive, or ever been alive, or so far as we know will be alive, who will benefit from that injunction. Because there are no sales of NILs that we know of. The plaintiffs made no effort to put any record together to show that there were sales or licenses of NILs. In this court's opinion on the merits, the only evidence that was cited, and in Judge Wilkins' opinion is the only evidence, was that EA, the video game manufacturer, testified that they might be interested in offering student athletes licenses for the use of their NILs in the future if they ever made a game again in the future. But, they don't have licenses from the schools or the NCAA, so they can't make a game. So, there are no transactions in NILs, so far as we know, involving current student athletes. Now, there are transactions, commercial transactions, in the post-collegiate world for NILs, where people sell their name, image, likeness, rights all the time. Kareem Abdul-Jabbar endorsed Chevrolet, and there was a lawsuit about it. Those are real transactions, but there are no NIL transactions that we know of relating to student athletes. And, one way that we know that it's important is if we look at the timeline. In the- About eight minutes, just reminding you. Sorry. You manage your own time, but- Thank you. I thought I was going to get a light. All right. One reason that we know that the lower court did not adhere to the commensurate test and instead adopted an impermissible all-or-nothing test is that after this court reversed in substantial part the $5,000 deferred payout, the district court, the fee award motion was pending before the district court when your opinion came down. And, the same decision, they didn't adjust for it. The same award was made. And so, we know it was not proportionate because the relief changed dramatically, and yet the award stayed the same at the substantially all of it. So, we know that that just doesn't pass the common sense test. Furthermore, the change made by the NCAA, which was consistent with its prior practice of allowing compensation as the court saw it, scholarships as we see it, up to COA. And, the change to making, allowing scholarships up to COA was already underway before this case was tried. In January of 2014, the autonomy rules were adopted by convention. The case was tried in the spring of 2014. The, it was adopted by the NCAA Board of Directors that allowed these enhanced scholarships. On August 7th of 2014, Judge Wilkins' opinion came down the next day on August 8th. We certainly didn't know when it was going to be handed down. And, they were in effect during the time that this court considered the appeal and the injunctions were stayed. So, the injunction, by the time it took effect in December of 2015, the new scholarships were already well in effect, had been underway for a long period of time, and nothing happened. There was no promise to keep it in effect, was there? I'm sorry. I'm sorry. My understanding is, because this was a matter of conversation between Judge Bivey particularly, that the NCAA said, yes, they're doing it. And, I think your counsel was asked a specific question, are you promising that you'll keep that rule in effect in the future? And, the answer was no, or something like that. Now, there was a petition for cert, wasn't there? Yes, there was. There were cross petitions. And, what were you seeking to have reversed? Well, there were several issues that were raised, but not that. There's no indication that anyone at the NCAA is trying to change the rule. But, I should point out, this court, in its opinion, said, and it quoted the district court on this point, that the NCAA could rescind the rule and go back from COA to GIA, so long as it didn't prohibit people from offering NIL revenues to fill that gap. There's no evidence that any of those things are ever going to happen or have ever happened. But, this court did say that the NCAA could so-called backslide. The rule is permissive. It doesn't require any school to pay COA. It doesn't mandate it. The bigger schools have more money. They pay COA now. The smaller schools are still at the old GIA. That's their right. That's their option. And so, despite that, despite the fact that there are still many student-athletes with gaps, plaintiffs chose to put no evidence in about NILs in the real world. I like to think of them as mythical creatures. They're like yetis bearing bitcoins. They just don't exist. No one's ever seen one. And, this court, in your opinion, said that you were not going to deal with the difficult question of whether NILs exist in broadcast. And, in fact, that is a difficult question. We still don't know if they do. So, I think I'm at the end of my time. Yes, very good. I'll reserve. Thank you. We have about three minutes and 30 seconds for rebuttal. Good afternoon. May it please the court, Jonathan Massey for the plaintiffs in this case. And, I'd like to begin with this court's 2015 decision, which described this case as momentous and said that the result obtained by the plaintiffs, quote, is the first by any federal court to hold that any aspect of the NCAA's amateurism rules violate the antitrust laws, let alone to mandate by injunction that the NCAA change its policies. You know, every previous challenge to the NCAA had failed, usually on motion, under the Board of Regents decision. And, the NCAA had never faced a trial on the antitrust issues. So, in awarding fees, the district court agreed that the plaintiffs had achieved an excellent result, even considering the elimination of the deferred compensation remedy on appeal. By the time the district court had awarded fees, this court had already ruled. So, at ER excerpts of record 10, the district court considered the elimination of the deferred compensation remedy and said that, nonetheless, the plaintiffs had achieved an excellent result. And, I think no matter what test you use, the, look, asking for what is the commensurate with the result test, or the relatedness test, where my friend on the other side said, all the work in the first three years came to nothing, which is false, and I'll get into that. Or, you apply some untethered proportionality test, which is not the law under Hensley, and I'll get into that too. But, under any test, we win. But, the correct way to analyze this case is first to ask whether we are substantially prevailing parties. The district court heard every argument that your honors have heard this morning, and it said in a 33-page opinion, which built on the magistrate judge's 28-page opinion, analyzing every objection by the NCAA. So, here's, let me tell you what my dilemma is in looking at the two opinions below. So, Judge Cousins goes through all of this very, very carefully. But, at the time that you were before Judge Cousins, all Judge Cousins had was the district court's order. That's correct. Our case comes down while this is pending before Judge Wilken, and she addresses it in very cursory fashion at pages 9 and 10 of her opinion. That's true. The deferred compensation remedy. But, she does address that. I don't think there's a burden on her to write a tome or a lengthy opinion. No, but we might have acknowledged that a significant part of her final order was reversed. Well, I think your honor used the word largely in saying we largely affirm, and you went out of your way to praise the opinion and the significance of the result. And, I think the injunction that this court affirmed confers a substantial benefit on the class, an enormous benefit, because it allowed the plaintiffs to go up to the cost of, allowed the students. The problem I have, counsel, is that Judge Cousins had no reason to sort of do this commensurability inquiry, and doesn't look like Judge Wilken really did it. Well, I think she recognized the, she didn't crunch the numbers, it's true. But, she recognized the excellent result because, and again, I don't think that this isn't a common fund case, where your honor, we're claiming a percentage of the benefit. We are claiming a lodestar amount, and she awarded, you know, no multiplier, as you know. So, she viewed this as a standard Clayton Act case, where the statute requires 15 U.S.C. 15 A, makes attorney's fees mandatory. And, there was an hourly rate, which the NCAA accepted. And, the volume of work was enormous and largely undisputed. I mean, there were eight summary judgment briefs with 17 expert reports. There were 14 class certification briefs with 11 expert reports. So, I think, and there was a three-week trial with 24 witnesses, you know. So, if you look at the volume of work, and the court's found at page ER 26, that's where the district court said the staffing was commensurable on both sides. There were 26 defense firms on the defense side. And so, if you view this under a normal Hensley approach, which you ask, was there a legitimate hourly basis for the volume of work here? The answer is clearly yes. And, that's what the magistrate judge analyzed. And, that's certainly what Judge Wilken affirmed. They didn't view it as all or nothing. They imposed, you know, the magistrate judge cut a million, $1.1 million in fees, $3.7 million in expenses. The district court cut $3.6 million in fees. They looked at the block billing and all the other objections you've heard this morning. So, I think on that basis, there's clearly an enormous record that supports this award. And, certainly within the district court's discretion. And, I think, you know, in Fox v. Vice, the Supreme Court has warned against micromanaging. So, I think appellate micromanaging of this kind of area. So, I think that the first approach can simply be to apply that standard Hensley result. Now, Hensley also asks whether the claims are related. And, that's another way to look at this case. The NCAA has proposed that you can simply forget about the first three years of the litigation. And, that simply has no basis. That argument lacks all merit. Because the first three years saw the development of the entire factual record of the case. Every trial witness was deposed during those first three years. And, the district court, in fact, had closed discovery in 2013. In other words, all the relevant discovery occurred during the very period that the NCAA says we shouldn't receive any fees at all. And, by the time 2013 rolled around, there was only a 35-day short discovery period where the district court permitted the depositions of the new class reps. So, the district court, from her firsthand vantage point, saw how the case was related over time. And, she expressly finds at page 10 and 10 to 12 of the excerpts of record, the magistrate judge found it the same way. That the case, the 2009 to 2012 claims were related to the 2013 claims. And, they involved the same restraint, the same no compensation rule for NILs. They involved the same restrictions on the same, in the two same markets, the licensing market and the college education market. And, from the beginning, my friend on the other side says amateurism didn't appear in 2009. And, that's not true. The NCAA pled amateurism as a defense to the very first complaint that was filed in this case. And, the television markets were always in the case. The very first complaints in this case included allegations about the, well, included current athletes, that supplemental excerpt of record 296. And, included or challenged to the restriction that students, quote, may not receive compensation beyond the educational expenses approved by the NCAA. That's at 311 and 312. So, the complaint, both the district court and the magistrate judge understood that the claims evolved over time. But, the test under Hensley is whether they are related. And, certainly, the courts below did not abuse their discretion in saying that the claims were related. They don't have to be identical under Hensley. It's simply not, the test is whether they're related. But, let's look at the other way you could look at the case, which is the way my opponent wants to look at it, which is what's the money value of the injunction? And, I agree that district court didn't assign him any value. She didn't have to under Hensley. There's no, this is not a common fund case. And, she wasn't having to assign a monetary value to the settlement. But, if you want to go down that road, I think it's clear that there's an enormous monetary benefit to this settlement. Because, this case, this injunction in this case, which issued on August 8th, 2014 created a cost of attendance standard that the NCAA had not yet adopted. The vote on August 7th that my friend on the other side refers to was just a vote by the Board of Governors that was a preliminary vote authorizing conferences to go that way if they wanted to. It wasn't a change in the rule. And, it created the possibility of backsliding. Because, as your Honor knows in footnote 18 of this court's opinion, you actually referred to the fact the injunction did not change, did not prevent the NCAA from changing its mind and going back. And, there was a real danger of backsliding. Because, in 2011, the Board of Governors had taken a similar vote to initially preliminarily authorize a $2,000 stipend for each athlete. And, that never went into effect because the member schools overrode that vote. And, that's also in the record at pages 201 to 220 of the supplemental excerpts of record. So, the danger of backsliding was real. Anyway, the district court's injunction on August 8th, 2014 came before any change of rules by the NCAA. And, we know that actually because the NCAA reacted to it by asking the court to defer enforcement of the injunction. Because, it said schools needed time to comply with the quote new rules. And, that's also in the record at SER 61 to 63. So, the district court injunction was the catalyst, was the change that caused the NCAA to move to cost of attendance. And, the value of that was actually in the record at the time of trial. It's in pages 26 to 27 of our brief. But, if you want to look at the settlement, the grant and aid settlement that has happened after our case, after the injunction in our case, you can see and this court actually mentions it in its own opinion. It's about a $6,000 difference per student between grant and aid and cost of attendance. So, if you want to monetize the injunction, it's about $6,000 per student in perpetuity. The settlement and grant and aid is a backward looking remedy that went from 2000 to 2017. Our injunction goes forward from August 2014. Well, went to effect a year later. But, goes went forward, goes forward in perpetuity, generating that benefit over and over again for every student who will ever go to college and receive financial aid under the injunction. So, that's, you know, conservatively in our brief, we talk about could be tens of millions per year, aggregated hundreds of millions. Again, this isn't a common fund case. But, if you're asking what are the numbers involved, it's in the hundreds of millions of dollars. And so, I think that is a fair basis to say that this is a proportionate to any benefit. My friend on the other side says this is a fictional market. There's no market for NILs. So, all this value means nothing. Well, that's actually not true. There's plenty of evidence in the record because the NCAA right now is selling NILs. That's where it generates this enormous television revenue and other revenue that supports college sports. And that record is, that evidence is all over the record for example, ER 91, 199, 202, SER 103, 104, 165, 67. I mean, after the injunction went into effect, we know that 265 colleges have moved to cost of attendance and are able to pay that. And so, there's plenty of evidence in the record. In fact, at trial, one of the NCAA's own witnesses, Dr. Rubenfeld, said that one potential outcome could be, quote, sharing revenue up to the cost of attendance. That's in our brief at page 36. So, if you're looking for evidence of what is the value of the injunction, what are the value of NILs, there's plenty of it. And there's actually, in the fee briefing, trial docket 469. So, in the district court, we filed a brief on fees and 469, which lists statements by a number of people, including the chairman of the board of governors of the NCAA, who said in August 2015, schools among the five elite conferences were saying, look, we can afford to do it. We just need the ability under the NCAA rules to do it. So, he was saying that that was his statement in reaction to the district court's injunction. So, he recognized that this, even the NCAA's own chairman of the board of governors was recognizing the value of the injunction here. And I do think there was talk about the EA settlement and how we didn't get, we didn't get everything we asked for. The district court trimmed the EA amounts from our requested fee award. And that's reviewed under an abuse of discretion test. I don't see any basis in the district court's decision for overturning that. My friend on the other side said we didn't get damages that we sought. And I think, I mean, that's true. But again, the plaintiffs voluntarily excluded from their fee request any fees that govern damages. So, that, the fact that we didn't get damages is neither here nor there. That's out of the, we weren't seeking fees for that in the first place. And I do think it's important when you're analyzing the, sort of, the degree of success and if the commensurate to the benefit kind of test, to keep in mind this court's language in Cabrales, which is a 1991 decision cited in the briefs, that says, we read Hensley as establishing the general rule that plaintiffs are to be compensated for attorney's fees incurred for services that contribute to the ultimate victory in the lawsuit. Thus, even if a specific claim fails, the time spent on that claim may be compensable in full or in part if it contributes to the success of other claims. Indeed, it is rare, rare indeed is the litigant who doesn't lose some skirmishes on the way to winning the war. Lawsuits usually involve many reasonably disputed issue. And a lawyer who takes on only the battles he's certain of winning is probably not serving his client vigorously enough. The county would have a scalpel out attorney's fees for every setback regardless of its relationship to the ultimate disposition of the case. This makes little sense. So we think that this court has established that it's okay to lose sometimes in your case. You don't have to prevail on every single claim in order to be entitled to fees for all of the claims. I mean, Cabrales was awarding fees, let me be clear, for an unsuccessful stage of the case. Something the plaintiffs lost, but it was related to their successful claims. And so the court is saying, this court is held over and over again in cases like Webb v. Sloan. And Hensley itself applies this principle. You're entitled to fees even for parts of the case that you lose so long as they're related to the successful parts. And the district court is in the best position from its firsthand vantage point to make that assessment. And that's what the court did in this case. That's what Judge the Magistrate did. And that's what Judge Wilkin did. And Your Honor, Judge Bybee, you're completely right that the district court did not have the benefit of that last bit of this court's ruling. I'm sorry. The magistrate did not have the benefit of the last bit of this court's ruling. It wasn't just the last little bit. It was actually pretty significant. I don't mean to understate it. But I do think that the district court did. She didn't write a lot about it. But I think under Hensley, it's not in any way dispositive of the reasonableness of the attorney's fees here. That under Hensley, so long as the successful claims are related to the unsuccessful claims, even if you view the deferred compensation remedy as an unsuccessful claim, that we would still be entitled to recover fees on that. It wasn't really a separate claim anyway. It was just part of the remedy. So I don't think losing that can in any way impeach the relatedness determination by the district court. Let me ask you about media-related fees. Yes. Obviously, we have case law that says they are recoverable if you can show a nexus. Right. And I didn't see, and maybe I missed it, a district court finding on that issue. She did rule on the media fees, but seemed to lump it all together and say you're entitled to media fees because that's important in these kind of cases. Right. She did apply Davis that way. So the two critical pages are SER-19 and ER-19 on media fees. And what happened at SER explains the plaintiffs did not include requests for media fees except in respect of their assistance to their clients in handling media interviews. In other words, if the clients needed help in responding to press inquiries, the lawyers helped them. The lawyers did not include every media appearance issue or matter in the claim for media fees. So I think the record clearly shows that the only media fees that were sought were media fees rendered by lawyers in connection with their services to their clients. And I think under Davis, that is clearly legitimate and reasonable. In other words, Davis says you're allowed to use, you're allowed to charge for media fees so long as they're in furtherance of the litigation. And here, that is exactly the kind of service that a private client would pay for to a lawyer. So I commend those two pages. And I do think that the district court's exercise of its discretion on that is reasonable. And let's see. I think if there are no further questions, I would commend that in every respect here, the district court has examined every different issue. And I think I mentioned a Game of Thrones business. I don't think the district court saw this as all or nothing. Obviously, the district court trimmed $3.6 million in fees. I don't think she felt in any way required to accept the fees request in its entirety. Obviously, the magistrate also trimmed. He didn't see this as an all or nothing deal. The only thing that was really all or nothing in this case was the risk faced by the plaintiffs. I mean, if we had lost, we'd get nothing. And even though they'd invested $42 million in time and expenses over that, it would have come to nothing. And so one thing I think that's important is you don't want to disincentivize plaintiffs from trying cases. It's easy for the plaintiffs to simply settle before trial and then get a non-objection from the defendants to their fee request, which is happening grant and aid. And if you have plaintiffs who are fighting hard for their clients and taking cases to trial, which ultimately I think is in the public interest as shown by the Clayton Act and the Sherman Act, the Clayton Act provision of attorney fees, Congress wants private attorney generals willing and able to prosecute cases to trial. And it would disincentive plaintiffs from doing that if the Hensley inquiry becomes the second major litigation on fees where the plaintiffs have to wait. They've already waited four years. The NCAA's lawyers haven't waited at all. They didn't take this case on a contingency. So there is, I think, important public interest here under the Clayton Act in ensuring that we adhere to what the Supreme Court says about appellate micromanagement of district court decisions. I mean, that is the one common theme in every Supreme Court decision on fees is the appropriate role of the district court and the importance of deference to the on-the-ground firsthand vantage point that the district court has in overseeing the litigation, understanding the relatedness and the unrelatedness of various claims, seeing the staffing by each party, understanding the number of lawyers involved on each side, which as the district court said at pages 26 and the magistrate says at ER 133, the staffing was the same on both sides. It was a hard-fought, complicated case that involved, you know, as I mentioned, 76 depositions, a million pages of documents, lots of hard-fought over six years. And so the district court saw this, understood the effort that had been put on both sides and recognized that the plaintiff's fee award was reasonable. Thank you. Thank you, counsel. Just to return to one point, the Ninth Circuit, this court has said in McGinnis versus Kentucky Fried Chicken, and I quote, it is an abuse of discretion to ignore the extent of success and the amount of the fee. And Fox v. Vice, the Supreme Court of the United States said all or nothing is error. And that's what we have here. Judge Wilkin did say in her opinion, and we think this was error as well, that the full fee or essentially a full fee was to be awarded because of quote, excellent results and cited Hensley for that. But if you actually read that portion of Hensley, it's clear what the Justice Powell was giving an example, and it's inconsistent with the actual holding. What he said was, on the one hand, you might have a case with excellent results and you should get a full fee. That's where you win everything. On the other hand, you might win one thing out of 10 and you would have to get it reduced. So to take it to a logical extreme, if you had a hundred claims and you got one, you would have to have some proportionality. And so then we go to the question of, were the claims related from the earlier period? Different parties, both on the plaintiff and the defendant side, different theory of liability. Amateurism was not a defense. It was, we raised it as a defense and they argued over and over again that it was not a defense because they were talking about- It was an issue. I think it was their point. I don't think they said they prevailed on that. I think that they suggested that it was, that you had raised it. That is that amateurism, amateurism was still at the heart of claims that were made and the defenses that were offered. They said amateurism didn't apply after student athletes were out of school, which is true. And they represented that to the district court and other district courts over and over again. We quote at page seven of our brief, this case does not involve questions of the protection of amateur sports, the student athlete experience or other goals. And they said it in several different ways. Their second amended complaint affirmatively pled that amateurism was not involved. And we agreed. So long as you're talking about former student athletes, amateurism is no longer applicable. But then the second case starting in 2013 involved current student athletes. Judge Wilkins said that they didn't have any plaintiffs withstanding. They went out and found new plaintiffs in order to pursue that. EA and CLC were not defendants in the second case. Only the NCAA was. The conspirators were different. The alleged conspirators were the schools and the conferences. Everything about it was a different theory. So under this court's decisions on what is and is not related, those two theories of the case, those two, we called them a tale of two cities. Those two cities were not sufficiently related. There are cases from this court saying that if a plaintiff alleges wrongful arrest and a wrongful strip search, that those two claims are not related, arising out of the same arrest. These clearly are further apart than that. Those at least are coterminous in time. So I think I'm out of time. The last thing I want to say, if I may, is that the argument made by opposing counsel sort of slides back and forth on what the injunction is. They take credit for the injunction moving the scholarship from GIA up to COA. But that's not true. The injunction is very clear, and this court was very clear, that you were talking about an NIL injunction because that was the basis of liability. And they don't get credit for all of the voluntary decision of the NCAA and its members to use some of the extra TV money that the big schools and big conferences got to fund these additional scholarships. They're unrelated to this injunction, and the record is very clear on that. Thank you very much. Thank you, counsel. Thank you all for your arguments and your briefing, and the case just argued to be submitted for decision. We'll be in recess for the afternoon.
judges: Thomas, Bybee, Quist